# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

№ 24-CV-2428 (RER) (LB)
_____

CARA CASTRONUOVA, JOHN TABACCO,

PLAINTIFFS,

VERSUS

ED COX, NEW YORK REPUBLICAN COMMITTEE,
NEW YORK STATE BOARD OF ELECTIONS,

DEFENDANTS.
_____

**MEMORANDUM & ORDER**

May 9, 2024
_____

**RAMÓN E. REYES, JR., U.S.D.J.:**

Plaintiffs Cara Castronuova ("Ms. Castronuova") and John Tabacco ("Mr. Tobacco") (collectively, "Plaintiffs") brought this action pro se "challenging the constitutionality of the ballot access rules for the primary election for United States Senator (the "Primary") that will be held by the New York Republican State Committee [], led by Ed Cox, and overseen by the New York State Board of Elections [] on June 25, 2024." (ECF No. 1 ("Compl.") ¶ 2). Currently before the Court is Plaintiffs' motion for a preliminary injunction ("PI Motion") to place Ms. Castronuova's name on the Republican Primary ballot for United States Senator. (ECF No. 3 ("PI Motion")). Defendants Ed Cox and New York State Republican Committee (collectively, "NYRC" or "NYRC Defendants"), and the New York State Board of Elections ("NYSBOE") (collectively with

NYRC, "Defendants") oppose the PI Motion and separately move to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF Nos. 18, 22). After carefully reviewing the record, and for the reasons set forth herein, Plaintiffs' PI Motion is denied.[1] Plaintiffs filed an Amended Complaint (ECF No. 47) as a matter of course pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, therefore Defendants' motions to dismiss (ECF Nos. 18, 22) are denied without prejudice.[2]

## **BACKGROUND**

I.    Factual Background

New York Election Law ("NYEL") provides for more than one route to a statewide primary ballot. Under NYEL § 6-104, candidates may seek a certificate of designation by their political party for nomination for office. (ECF No. 20 ("Zebrowski Staviski Decl.") ¶¶ 2-4). To successfully be certified as a party's chosen nominee, a candidate must be

---

[1] Given the denial of Plaintiffs' PI Motion, their motion to reconsider the denial of their application for a temporary restraining order (ECF No. 18), is also denied. Should Plaintiffs choose to appeal from this Order to the United States Court of Appeals for the Second Circuit, their notice of appeal must be filed with this Court within 30 days. *See* 28 U.S.C. § 1292(a)(1); Federal Rule of Appellate Procedure 4(a)(1); *Adams v. Standard Fed. Bank*, 371 F. App'x 187 (2d Cir. 2010) ("This Court has jurisdiction to review the denial of a preliminary injunction pursuant to 28 U.S.C. § 1292(a).")

[2] *See Gentleman v. State Univ. of New York-Stony Brook*, No. 16-CV-2012 (ADS) (AKT), 2016 WL 6892151, at *3 (E.D.N.Y. Nov. 21, 2016), *aff'd*, No. 21-1102-CV, 2022 WL 1447381 (2d Cir. May 9, 2022) ("Where, as here, the Plaintiff seeks to further amend his complaint while a motion to dismiss is pending, the Court has a variety of ways in which it may deal with the pending motion to dismiss, from denying the motion as moot to considering the merits of the motion in light of the amended complaint.") (citations omitted). The Amended Complaint is now the operative pleading in this case. *See id.* Absent further Orders from the Court, Defendants shall respond to the Amended Complaint within 21 days of this Order. Should Defendants seek to dismiss the Amended Complaint, perhaps by demonstrating why any newly alleged facts do not cure the deficiencies explained herein, Plaintiffs shall have 14 days thereafter to reply to Defendants' motion. Plaintiffs may only file a second amended complaint if the Court grants Plaintiffs leave to do so. *See id.* ("Rule 15(a) allows for only one amendment as of right . . . even though the [Defendants] moved to dismiss the amended complaint . . . at some point the opposing party should be allowed to rely on his adversary's pleading so that he is able to prepare an adequate responsive pleading.") (citations omitted).

picked by a majority vote in that party's state committee. (*Id.*); NYEL §§ 6-104; 2-102. Alternatively, candidates that receive 25 percent or more of the vote at the meeting of their party's state committee may make a written demand to NYSBOE that their names appear on the ballot. (Zebrowski Staviski Decl. ¶ 4); NYEL § 6-104(2).

Yet another alternative is for candidates to obtain electorate signatures and file designating petitions to request NYSBOE to place their names on the ballot. (Zebrowski Staviski Decl. ¶¶ 6-7); NYEL §§ 6-130, 6-136. For a designating petition to be successful, it must include a certain number of signatures and adhere to the conditions set forth in § 6-136. (*Id.*) For the Primary at issue here, that number is the lesser of 15,000 signatures or five percent of the total number of enrolled Republican voters in New York State.[3] *Id*. Candidates have 37 days to collect the requisite number of signatures and submit their designating petitions. (*Id.* ¶ 10); NYEL § 6-134(4).

In addition to the formatting requirements and information specifications for the designating petitions, there is a geographical component; at least 100 signatures must be obtained from each of 13 of New York's 26 Congressional districts, or "1,300 of the required 15,000 signatures." (Zebrowski Staviski Decl. ¶ 7). Petitions must include: "(i) the date the signature is put on the petition; (ii) the signature of the voter; (iii) the 'residence address' of the voter including only the street number and name[]; and (iv) 'Town or City' or in New York City, the 'County.'" (*Id.* ¶ 20). These specifications, referred to by the parties as the "town/city trap," allow signatures to satisfy the geographical

---

[3] As of April 15, there were more than 2.9 million voters enrolled in the New York State Republican Party, and more than 2.6 million of those voters were active. (Zebrowski Stavisky Decl. ¶¶ 12-14).

component because each town, city, or county (in the case of very large cities), typically corresponds with a voting district. (Zebrowski Stavisky Decl. ¶¶ 20-24; ECF No. 19 at 5). This information may be filled in or corrected by the witness to the signature. (Zebrowski Stavisky Decl. ¶ 24); NYEL § 6-134(6). The NYSBOE publishes guidance about this process online and answers candidates' questions it receives. (*Id.* ¶ 25).

Upon submission of a designating petition, the NYSBOE applies a presumption of validity to the signatures it contains. (*Id.* ¶ 8). Once submitted, a designating petition is viewable by, and open to objections from, the public. (*Id.* ¶¶ 8, 16). Objections can be made by administrative process with the NYSBOE or judicial intervention. *See* NYEL §§ 6-154, 16-102. Surely, any voter may file a specific or general objection to designating petitions, regardless of their candidacy status or party membership. (Zebrowski Staviski Decl. ¶ 16; ECF No. 36 ¶¶ 12-21). When an objection is made, candidates receive both (a) notices of the objections filed in relation to their designating petitions and (b) notices of the opportunity to defend their petitions at a hearing. (Zebrowski Staviski Decl. ¶¶ 16-18); NYEL § 6-154. After reviewing the petition and hearing from candidates and objectors, the NYSBOE holds a meeting and determines whether the petition complies with the requirements set by statute or needs to be cured. (*Id.*) In the absence of satisfaction of the cumbersome requirements set forth by the NYEL, and if candidates fail to cure a petition by the noticed deadline, the NYSBOE may deem the petition invalid. (*Id.*) Candidates and objectors are both notified of the result. (*Id.*) These deadlines are necessarily constrained by the need to have a timely election. *See* NYEL § 4-110 (the deadline for NYSBOE to certify this year's Primary ballot was May 1, 2024); 52 U.S.C.A.

§ 20302(a)(8) (the mailing of military ballots must occur no later than 45 days before the election).

Should a designating petition ultimately not be certified by the NYSBOE, candidates still have options to move forward in the race for a seat in the United States Senate. Under NYEL § 16-102, candidates may bring an expedited action in state court seeking review of NYSBOE's decision. (Zebrowski Staviski Decl. ¶ 18; ECF No. 22 Ex. 1 at 4-5); s*ee, e.g., Zobel v. New York State Bd. of Elections*, 254 A.D.2d 520, 521 (3d Dep't 1998) (in such an action, the court considered and rejected a constitutional challenge to the "town/city" provision). If that proceeding is unsuccessful, candidates may still attempt to persuade voters to write their names on the ballot on the day of the Primary in June. (Hrg. Tr. dated 4/10/2024); [4] NYEL § 6-166. Accordingly, there are many opportunities for a candidate to establish they have the support of potential voters in running for the Senate seat.

Ms. Castronuova has taken some, but not all, of the steps in the process outlined above. She initially sought designation by the Republican party for nomination in the Primary and obtained over eight percent of her party committee's votes at the February 22, 2024, convention. (Compl. ¶¶ 49-50); NYEL § 6-104. Ultimately, the Republican party chose another candidate as nominee at their committee meeting, and as a result, his name will be on the Primary ballot. (*See* Zebrowski Staviski Decl. ¶ 5; Compl. ¶¶ 50-54). Ms. Castronuova did not receive 25 percent or more of the vote at the meeting, and so

---

[4] The Court has reviewed a draft transcript of the hearing held on April 10, but presumably because the parties have not yet ordered copies of it, the transcript has not yet been docketed.

she did not pursue the option of demanding her party to file a certificate on her behalf pursuant to NYEL § 6-104(2). (Compl. ¶¶ 54-57). Instead, Ms. Castronuova and her supporters got to work on the next option to access the ballot by gathering signatures for a designating petition. (*Id.*). As of April 1, 2024, Ms. Castronuova had close to 13,500 signatures in her support (Compl. ¶ 76), and she filed her designating petition (the "Petition") by April 4 with 15,729 presumptively valid signatures. (Zebrowski Staviski Decl. ¶ 19). In the days that followed, Plaintiffs commenced this action against Defendants, and the Petition was reviewable by the public. (Compl. ¶¶ 57-60). Ms. Castronuova has defended her Petition against many objectors and indicated her intent to continue to do so in both hearings with the NYSBOE and in case filed in Albany County Court. (*See* NYSCEF Index No.: 903687-24 ("Albany Case"); ECF No. 32 ¶¶ 16-18; ECF No. 26 at 2-3; ECF No. 41 at 2; ECF No. 35 at 2). To date, the Albany Case has not decided the validity of the Petition or the objections it faces. (*See* ECF No. 42 at 2).

II.     <u>Procedural History</u>

Plaintiffs filed their pro se Complaint on April 1, 2024, alleging NYEL §§ 6-104, 6-130, 6-136 violate the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment, by unduly burdening the rights to vote and associate, and by treating a party's "chosen" candidates differently. (*See* Compl.) The Complaint seeks: (1) a determination that the challenged statutes are unconstitutional; (2) an injunction ordering Ms. Castronuova's name to appear on the ballot in the Primary; (3) an opportunity for Tabacco to vote for Castronuova in the general election in

November; (4) unspecified damages; and, (5) costs and attorney fees.[5] Also on April 1, Plaintiffs filed their PI Motion. (ECF No. 3).[6]

On April 4 and 5, NYRC Defendants and Defendant NYSBOE each sought leave to move to dismiss the Complaint and requested a conference to oppose the PI. (ECF Nos. 11, 14). On April 5, Plaintiffs filed a letter requesting a hearing (ECF No. 15) and an Emergency Motion in support of a Temporary Restraining Order ("TRO Motion"). (ECF No. 16). The TRO Motion sought the relief of assignment of a District Judge, disclosure of why prior judges had recused themselves,[7] and the "tolling of the petition deadline until such time as the matter can be heard by the [C]ourt." (ECF No. 16 at 5).

On April 10, the Court held a hearing to discuss the TRO Motion, PI Motion, and Defendants' anticipated motions to dismiss. (Order dated 4/8/2024; ECF No. 17). At the hearing, the Plaintiffs presented the arguments made in their filings, offered a copy of the form Plaintiffs and their supporters used to collect signatures for Ms. Castronuova's Designating Petition, and gave statements of fact in support of their claims. At the

---

[5] The Complaint requests "reasonable attorney fees" under 42 USC § 1988, but fees are not available to pro se litigants. *See Kay v. Ehrler*, 499 U.S. 432, 435 (1991).

[6] On April 3, Plaintiffs filed a proposed Order to Show Cause seeking much of the same relief the Complaint seeks, in addition to tolling the ballot access petitioning process and designating petition filing period until this matter can be heard. (ECF No. 5 ("OSC")). The Court did not sign the OSC.

[7] Upon reassignment to the undersigned on April 7, the requests relating to assignment of a District Judge became moot. Recusal is soundly within a District Judges' discretion, and contrary to Plaintiffs' contention, 28 U.S.C. § 455 does not require a statement of reasons for recusal on the record. *See Cox v. Onondaga Cnty. Sheriff's Dep't*, 760 F.3d 139, 150 (2d Cir. 2014); *see also Longi v. New York*, 363 F. App'x 57, 58-59 (2d Cir. 2010). Plaintiffs also cited to *Liteky v. United States*, but that was a criminal case where the District Judge had properly denied a petitioner's disqualification motion. 510 U.S. 540, 543 (1994).

conclusion of the hearing, the Court denied Plaintiffs' motion for a TRO, and set a briefing schedule for the PI Motion and Defendants' motions to dismiss. (ECF No. 17).

On April 15, Defendant NYSBOE filed a consolidated memorandum of law in opposition to the PI and in support of their motion to dismiss (ECF Nos. 18, 19), alongside a supporting declaration of Kristen Zebrowski Stavisky. (Zebrowski Stavisky Decl.) That day, NYRC Defendants also filed a consolidated memorandum of law joining NYSBOE. (ECF No. 22 Ex. 1; ECF No. 22). To the extent Defendants have requested joint consideration of their motions to dismiss, those requests are granted.

Between the hearing held on April 10 and April 24, more than 35 separate documents were filed in support of Plaintiffs' claims.[8] These documents include several letters and declarations by Plaintiffs, some of which attached exhibits. (ECF Nos. 24, 26, 31, 32, 35, 36, 39, 49; ECF No. 31, Ex. 1; ECF No. 32, Exs. 1-10; ECF No. 36, Exs. 1-8). The attachments to these letters and declarations include examples of challenges and objections made to the Petition (ECF No. 32, Exs. 1-5, 7-10) and filings in the Albany Case to invalidate the Petition. (ECF No. 32, Ex. 6; Albany Case). Plaintiffs also filed copies of general objections to the Petition, supplemental filings from the Albany Case, the "Board of Elections in the City of New York" rules for all primary elections in New York City, news articles, and a mail label from John F. Haggerty to NYSBOE. (ECF No. 36, Exs. 1-8). Plaintiffs' letters and declarations refer to an "Exhibit P" as "proof" from a handwriting expert that two of the objectors' "signatures are fraudulent and forgeries," but

_____

[8] Including the documents filed prior to the hearing, and the newly filed Amended Complaint, Plaintiffs have filed at least 45 documents for the Court's consideration.

none of the exhibits attached to any of Plaintiffs' filings match that description. (*See* ECF No. 36 ¶¶ 5-8; ECF No. 40 at 4). Mark Szuszkiewicz and Jim Toes, two Republicans who previously attempted to gain access to ballots, and Evette Jody Stark, Tiny Ryan, and Randy Ireland, each of whom collected signatures for the Petition, all filed declarations detailing their respective petitioning experiences. (ECF Nos. 25, 28, 29, 37, 38).

On April 22, Defendants filed two letters disputing some of the facts alleged and opposing all the legal arguments made in Plaintiffs' additional filings. (ECF Nos. 33, 34). Plaintiffs filed a 42-page Amended Complaint on May 3, 2024, as a matter of course, which was entered on the docket and received by the undersigned on May 7, 2024. (ECF No. 47 ("Amended Complaint")).

The Court has carefully reviewed all of Plaintiffs' numerous filings to date. The filings made up and until the Amended Complaint are construed to have been filed in support of Plaintiffs' PI Motion. (*See* Order dated 4/18/2024). Mindful of the need to issue this Order and decide the PI Motion in a timely manner, and in light of the Court's prior Order allowing the parties until April 22, 2024, to file material in support of or opposition to the PI Motion, the facts alleged in the Amended Complaint are not incorporated fully in this Order. (*See id.*) In an abundance of caution, the Court notes having reviewed the Amended Complaint in full and determined that the allegations therein do not change the outcome of the PI Motion because Plaintiffs are still not likely to succeed on the merits. Regardless of whether Plaintiffs' allegations that the objections to the Petition were brought by or with the help of any individuals associated with the Defendants are true, NYEL allows for *any* voter to challenge a Petition, regardless of party affiliation, and regardless of whether they have counsel or work alone. (*See* Zebrowski Staviski Decl. ¶

16; ECF No. 36 ¶¶ 12-21). That allowance is constitutional. *See Soleil v. State of N.Y.*, No. 04-CV-3247 (DGT), 2005 WL 662682, at *5 (E.D.N.Y. Mar. 22, 2005); *Queens Cnty. Republican Comm. ex rel. Maltese v. New York State Bd. of Elections*, 222 F. Supp. 2d 341, 351 (E.D.N.Y. 2002); *Dekom v. New York*, No. 12-CV-1318 (JS) (ARL), 2013 WL 3095010, at *2 (E.D.N.Y. June 18, 2013), *aff'd*, 583 F. App'x 15 (2d Cir. 2014). The issue of whether Plaintiffs state any legally cognizable claims as supported by any new facts alleged in the Amended Complaint will be considered upon the filing of any forthcoming motions to dismiss, and after any subsequent responses by Plaintiffs filed within 14 days of such motions to dismiss. Plaintiffs may not file a second amended complaint—or any additional motions—without leave of the Court. *See Gentleman*, 2016 WL 6892151, at *3; *see also* Indiv. Rule No. IV.

In support of their PI Motion, Plaintiffs argue their rights to vote and freely associate are unduly burdened by the process in place to access the ballot in the Primary in violation of the First and Fourteenth Amendment. (Compl. ¶ 2, 33, 112-123). Plaintiffs claim the statutory requirements are the same, in effect, as those implicated in the presidential primary several years ago, because they make petitioning "impossible." (Compl. ¶¶ 1, 10-14, 28-30, 72, 80, 94, 102; ECF No. 38 ¶¶ 5, 11; ECF No. 37 ¶¶ 8, 10; ECF No. 29 ¶ 16). In support of their arguments, Plaintiffs point to the valiant efforts made by them and their supporters in attempts to obtain sufficient signatures in a very short time. (Compl. ¶¶ 14, 61, 64, 66-69, 76-78). The "town/city trap," or requirement that petitions include specific information about where a signatory is registered to vote, is, according to Plaintiff, an unfairly technical and difficult to follow rule, that allows petitions to be thrown out, and does not further any government interest. (Compl. ¶¶ 21-23, 61, 102).

Plaintiffs claim there is not sufficient notice of—or time to respond to—challenges to their Petition. (Compl. ¶¶ 107, 120; ECF No. 32 ¶ 33). In making this argument that there is not enough due process, Plaintiffs point to, in part, the overwhelming amount of process they face in the form of hearings with the NYSBOE and in State Court. (ECF No. 32 ¶¶ 11). Plaintiffs additionally claim that they, their supporters, other candidates not backed by the Republican party, and their respective supporters, are treated unfairly when compared to the candidate chosen by the Republican party to appear on the Primary ballot. (Compl. ¶¶ 7-9, 17, 32, 38, 45, 55, 110). In more recent filings, Plaintiffs have also alleged suspicions of collusion by certain members of the Republican party and the NYSBOE in opposing their Petition by fraudulent means. (ECF No. 24 at 1; ECF No. 41 at 1-3; ECF No. 40 at 4; ECF No. 36 ¶¶ 7-8, 22, 24, 32; ECF No. 32 ¶¶ 11).

Plaintiffs ultimately request that this Court find the statutory scheme to petition for ballot access to the Primary unconstitutional and order Defendants to place Ms. Castronuova's name on the Primary ballot. (Compl. ¶ 131; *see generally* ECF Nos. 3, 24, 32, 35, 41, 61). In addition to injunctive relief, Plaintiffs seek damages for the time and money expended in support of their Petition. (Compl. ¶¶ 36, 65, 78, 131).

## DISCUSSION

I.  Preliminary Injunction Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Though the injunction "is one of the most drastic tools in the arsenal of judicial remedies," the "district court has

wide discretion in determining whether to grant a preliminary injunction." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citations omitted).[9]

"The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). For prohibitory injunctions, the moving party must establish by a preponderance of the evidence the following four elements: (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation; (3) the balance of the hardships tips toward the moving party; and (4) the public interest would not be disserved by issuance of an injunction. *See Monserrate v. New York State Senate*, 599 F.3d 148, 154 (2d Cir. 2010); *Salinger v. Colting*, 607 F.3d 68, 77 (2d Cir. 2010); *Home It, Inc. v. Wen*, No. 19-cv-7070 (MKB) (VMS), 2020 WL 353098, at *3 (E.D.N.Y. Jan. 21, 2020) (J. Chen).

Where plaintiffs are "challenging governmental action taken in the public interest pursuant to a statutory or regulatory scheme," however, they "cannot rely on the fair ground for litigation alternative" for the second element, and instead "must establish a likelihood of success on the merits." *Monserrate*, 599 F.3d at 154. Moreover, a court may enter a mandatory preliminary injunction—an injunction that "alter[s] the status quo by commanding some positive act," *Tom Doherty Assocs., Inc.*, 60 F.3d at 34, "only if it

_____

[9] On a motion for a preliminary injunction a district court's legal rulings are reviewed de novo and its ultimate denial of a preliminary injunction for abuse of discretion. *McCreary Cty. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 867 (2005); *Almontaser v. N.Y.C. Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008). "A district court abuses its discretion when it rests its decision on a clearly erroneous finding of fact or makes an error of law." *Almontaser*, 519 F.3d at 508.

determines that, in addition to demonstrating irreparable harm, the moving party has shown a 'clear' or 'substantial' likelihood of success on the merits." *Mastrovincenzo v. City of New York*, 435 F. 3d 78, 89 (2d Cir. 2006) (citation omitted).

Thus, because Plaintiffs challenge governmental action taken in the public interest and seek a mandatory injunction—an order requiring NYSBOE to place Ms. Castronuovo's name on the Primary ballot–they must establish: (1) irreparable harm; (2) a "clear" or "substantial" likelihood of success on the merits; (3) the balance of the hardships tips in their favor; and (4) the public interest would not be disserved by issuance of the requested injunction. Plaintiffs have not met this heavy burden.[10]

## II.    Plaintiffs are Not Likely to Succeed on the Merits

As an initial matter, the Plaintiffs have standing. While NYSBOE argues "claims against it for declaratory and injunctive relief must be dismissed because it is entitled to sovereign immunity," Plaintiffs need only to add the proper party to an amended complaint to cure this defect. *See Credico v. New York State Bd. of Elections ("Credico I")*, 751 F. Supp. 2d 417, 419–20 (E.D.N.Y. 2010) ("Nevertheless, [a] request for prospective

---

[10] To the extent the Court makes any findings of fact in this Order, those findings are made solely for the purposes of resolving Plaintiffs' requests for injunctive relief. In making these factual findings, the Court may consider hearsay evidence. *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010). Factual findings in this context are made pursuant to Fed. R. Civ. Procedure 52(a)(2). *See Home It, Inc.*, 2020 WL 353098, at *1. Certain facts, such as the number of enrolled voters, are "readily determined from sources whose accuracy cannot reasonably be questioned," and so the Court takes judicial notice of such facts for the purpose of both motions. *See La Vigne v. Costco Wholesale Corp.*, 284 F. Supp. 3d 496, 504 (S.D.N.Y. 2018), *aff'd*, 772 F. App'x 4 (2d Cir. 2019) (court may take judicial notice of matters of public record); *Adams v. Louis*, No. 15-CIV-2575 (AMD) (RLM), 2016 WL 816789, at *2 (E.D.N.Y. Feb. 29, 2016) (same). As Plaintiffs are pro se, the Court liberally construes Plaintiffs' pleadings and "interpret[s] them to raise the strongest arguments that they suggest." *Murawski*, 285 F. Supp. 3d at 695 (citing *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)). Additionally, when and if the Court considers forthcoming motions to dismiss, a different legal standard would apply, as explained more fully herein for the benefit of pro se Plaintiffs. (*See infra* Part IV).

injunctive relief is available against the Commissioners acting in their official capacities under the *Ex Parte Young* doctrine.") (citing *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir.2007)); *see also McMillan v. New York State Board of Elections ("McMillan I")*, No. 10-CV-2502 (JG) (VVP), 2010 WL 4065434, at *3 (E.D.N.Y. Oct. 15, 2010); *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14 (1985).

Plaintiffs have also alleged a particularized injury. *See Murray v. Cuomo*, 460 F. Supp. 3d 430, 443 (S.D.N.Y. 2020) ("To be sure, the Second Circuit has made clear that alleged constitutional violations presumptively constitute irreparable harm" even though "there is no freestanding [constitutional] right to be a candidate in an election.") (citing *Bery v. City of New York*, 97 F.3d 689, 693-94 (2d Cir. 1996)); *Credico v. New York State Bd. of Elections ("Credico II")*, No. 10-cv-4555 (RJD) (CLP), 2013 WL 3990784, at *9, (E.D.N.Y. Aug. 5, 2013) ("[T]he 'injury in fact' in an equal protection case is the denial of equal treatment resulting from the imposition of a barrier, not the ultimate ability to obtain benefits if that barrier is eliminated.") (citation omitted). In this Circuit, "the mere allegation of a constitutional violation" sufficiently "triggers a finding of irreparable injury," and the question of whether that injury is due to the infringement of a constitutional right bears instead on the likelihood of success on the merits analysis. *See Murray*, 460 F. Supp. 3d at 444-45. The Court therefore moves on to address the likelihood of success on the merits of Plaintiffs' constitutional claims.

A.    <u>Legal Framework for Assessing Plaintiffs' Constitutional Claims</u>

Constitutional analyses of statutes start with an assessment of whether there is a constitutional right before assessing whether the statute unconstitutionally burdens or infringes that right. *See Tiraco v. New York State Bd. of Elections*, 963 F. Supp. 2d 184,

14

193-94 (E.D.N.Y. 2013) ("The Fourteenth Amendment . . . provides that no state shall . . . deprive any person of life, liberty, or property, without due process of law[, and the] threshold question in adjudicating [a] due process claim is whether [plaintiff] possessed a liberty or property interest."); *see also Dekom*, 2013 WL 3095010, at *14 ("Ballot-access restrictions, like those at issue here, affect 'two different, although overlapping, kinds of [First Amendment] rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.'") In the context of voting rights cases, "the rigorousness of [the Court's] inquiry into the propriety of a state action depends upon the extent to which a challenged action burdens First and Fourteenth Amendment rights." *Monserrate*, 599 F.3d 148 at 155 (citing first *Burdick v. Takushi*, 504 U.S. 428, 432 (1992), then citing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

If the constitutional burden is severe, then strict scrutiny applies to the statute— "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Norman v. Reed*, 502 U.S. 279, 289 (1992). If the burden is not "severe," on the other hand, the regulation need only be rationally related to an important state interest. *Compare Yang v. Kosinski*, 960 F.3d 119, 129 (2d Cir. 2020) ("removal of ten out of eleven qualified candidates from a ballot, resulting in the cancellation of the election" was a severe "election-related restriction"), *with Ulrich v. Mane*, 383 F. Supp. 2d 405, 411 (E.D.N.Y. 2005) ("[W]hen a state election law provision imposes only reasonable, nondiscriminatory restrictions . . . the State's important regulatory interests are generally sufficient to justify the restrictions.") (citations omitted). In conducting this analysis, the Court:

> [M]ust weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.

*Burdick*, 504 U.S. at 434 (citations omitted). Accordingly, "if the burden imposed is less than severe and reasonably related to the important state interest, the Constitution is satisfied." *Monserrate*, 599 F.3d at 154-55. This "flexible" standard generally applies to both pre-vote and post-vote First Amendment and Fourteenth Amendment challenges. *See Id.* at 155. "The dispositive inquiry . . . is therefore whether the challenged restrictions are reasonable and non-discriminatory." *Murray*, 460 F. Supp. 3d at 445.

To determine whether there has been a Due Process Clause violation, "it is necessary to ask what process the State provided, and whether it was constitutionally adequate." *Rivera-Powell v. New York City Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) (quoting *Zinermon v. Burch*, 494 U.S. 113, 126 (1990)). There are separate due process requirements for (a) "claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Rivera-Powell*, 470 F.3d at 465. When the "deprivation [of life, liberty, or property] is pursuant to an established state procedure, the state can predict when it will occur and is in the position to provide a pre-deprivation hearing," whereas when the conduct is "random and unauthorized, the state satisfies procedural due process requirements so long as it provides a meaningful post-deprivation remedy." *Rivera-Powell*, 470 F.3d at 462-63, 465-66 (finding established procedures under § 16-102 that allow for the "opportunity to obtain full judicial review by way of a special proceeding" as constitutionally sufficient).

Finally, "[t]he Equal Protection Clause prohibits the government from denying any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *Tiraco*, 963 F. Supp. 2d at 199 (citing *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citations omitted)). The Equal Protection Clause does not mandate that every person receive the same outcome from the application of the law. *Id.* Instead, plaintiffs are either protected from discrimination based on protected class status or protected from being "treated differently than someone who is *prima facie* identical in all relevant respects.'" *See Tiraco*, 963 F. Supp. 2d at 200 (citing *Prestopnik v. Whelan*, 249 F. App'x 210, 212 (2d Cir. 2007)) (not being a "favored" candidate by a political party did not amount to protected class status, and the difference in treatment when comparing plaintiff to the "favored" candidates was not unconstitutional, but rather the result of a fair process).

Plaintiffs argue that the statutory scheme here violates the First and Fourteenth Amendments facially and as applied, but the success of their constitutional claims hinge upon whether the scheme itself affords equal and due processes before infringing upon First Amendment rights. *See Rivera-Powell*, 470 F.3d at 469-70 (after explaining "federal court intervention in garden variety election disputes is inappropriate," the Circuit held "that when a candidate raises a First Amendment challenge to his or her removal from the ballot based on the allegedly unauthorized *application* of an admittedly valid restriction, the state has satisfied the First Amendment if it has provided due process") (emphasis in original).

B.   New York Election Law Does Not Place an Unconstitutionally Severe
     Burden on Plaintiffs First and Fourteenth Amendment Rights

Ms. Castronuova does not have a fundamental right to appear on a ballot as a candidate, but rather a "right to campaign in an attempt to qualify to appear" on the ballot. *Murray*, 460 F. Supp. 3d at 445. "[C]andidates' and voters' associational and voting rights are qualified ones. Many restrictions, such as signature requirements, not only do not burden voters' constitutional rights to associate, but are, as a practical matter, necessary to ensure the orderly functioning of elections." *Rivera-Powell*, 470 F.3d at 469 n. 15. The Court of Appeals for the Second Circuit has reiterated that "a requirement that ballot access petitions be signed by at least 5% of the relevant voter pool is generally valid, despite any burden on voter choice that results when such a petition is unable to meet the requirement." *Prestia v. O'Connor*, 178 F.3d 86, 88 (2d Cir. 1999); *McMillan v. New York Bd. of Election ("McMillan II")*, 234 F.3d 1262, 1262 (2d Cir. 2000); *Ulrich*, 383 F. Supp. 2d at 407-08, 411 (E.D.N.Y. 2005); *see also SAM Party v. Kosinski*, 987 F.3d 267, 276 (2d Cir. 2021) (finding a requirement of 45,000 signatures to "pale in comparison to the ones the Supreme Court upheld" previously, because there, that number amounted to about one percent of the relevant voters). With Republican Party active enrollment at 2,695,185 in New York State, the signature requirement of 15,000 amounts to just 0.556% of the relevant voters, well below the presumptively constitutional cap. (Zebrowski Stavisky Decl. ¶ 14).

Further, "the requirement that candidates obtain a certain number of signatures within 3[7] days to appear on the ballot for the [P]rimary election" is also not unduly burdensome. *See Dekom*, 2013 WL 3095010, at *14-*15 (quoting *Anderson*, 460 U.S. at

787) (In *Dekom*, the applicable time frame was 38 days rather than 37, but the court explained why an even shorter time frame, 28 days, would also be permissible); *see Libertarian Party of New York v. New York Bd. of Elections*, 539 F. Supp. 3d 310, 324 (S.D.N.Y. 2021) ("Litigants have previously raised the argument that a 'signature-per-day' requirement is too onerous without success.") (collecting cases). The Supreme Court has been "unimpressed" with arguments based on the associated costs of collecting signatures within restricted time periods, because "[h]ard work and sacrifice by dedicated volunteers are the lifeblood of any political organization," and "some cut off period . . . is necessary . . . to verify the validity of signatures on the petitions, to print the ballots, and, if necessary, to litigate any challenges." *Libertarian Party*, 539 F. Supp. 3d at 324, 324 n. 8 (quoting *Am. Party of Texas v. White*, 415 U.S. 767, 787, 787 n.18, (1974)).

Plaintiffs point to the short time frame in conjunction with the practical difficulties of: (1) getting wet signatures; (2) working to "cure the pagination errors;" and (3) "accomplish[ing] th[e] arcane task" of addressing "hundreds" of general and specific objections "attempting to throw out . . . thousands of signatures based on arbitrary" requirements. (*See, e.g.,* ECF No. 32 ¶¶ 16, 21-25). While collecting wet signatures and responding to paper forms by mail may be painstaking and impractical in the digital age, "there is a distinction between constitutionality and wise policy," the latter of which is more appropriately taken up "with the legislature—not the courts." *Dekom*, 2013 WL 3095010, at *15 (citations omitted). To be sure, the statutory requirements at play are onerous, and "far more likely operate[] to restrict voter choice by keeping otherwise qualified candidates off of party primary ballots and by discouraging them from entering the race in the first place." *Ulrich*, 383 F. Supp. 2d at 407. Plaintiffs' argument that candidates must collect

30,000 or more signatures to overcome anticipated challenges also does not matter; a practical requirement of collecting 100,000 signatures would still be less than 5% of the active Republican voters, and presumptively constitutional. *See Ulrich*, 383 F. Supp. 2d at 411.

The documented difficulties Plaintiffs face are substantial, but unfortunately are of the kind and character the Constitution cannot remedy under the jurisprudence this Court must follow. As was the case almost twenty years ago, "[b]ecause the Second Circuit squarely has held that petition signature requirements more onerous than those faced by [Plaintiffs] are not severe within the meaning of the First Amendment, [the Court is] constrained to find that the[] signature requirement imposed by New York law likewise is not a severe burden, and thus one that candidates . . . may be forced to bear in order to achieve a place on the ballot." *Ulrich*, 383 F. Supp. 2d at 407–11. "What is ultimately important is not the absolute or relative number of signatures required but whether a reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot." *Libertarian Party of Connecticut v. Lamont*, 977 F.3d 173, 177-78 (2d Cir. 2020). The Court takes judicial notice of prior candidates that have managed to meet these requirements as indications that meeting such requirements is indeed possible. *See La Vigne*, 284 F. Supp. 3d at 504; *Adams*, 2016 WL 816789, at *2. In 2022, for example, three Republicans who were not designated by their party successfully qualified for primary ballots for statewide offices in New York by submitting petitions. (*See* Zebrowski Stavisky Decl. ¶ 15); *see also* NYSBOE Election Certifications, available at https://elections.ny.gov/election-certifications).

Plaintiffs' heavy reliance on *Molinari v. Powers*, 82 F. Supp. 2d 57 (E.D.N.Y. 2000), and *Rockefeller v. Powers ("Rockefeller II")*, 78 F.3d 44 (2d Cir. 1996), *aff'g* 917 F. Supp. 155 (E.D.N.Y.1996) (singular, *"Rockefeller I"*, together, "*Rockefeller*"), in support of their contention that the statutes at issue place an unconstitutional burden on their First and Fourteenth Amendment rights is misplaced. (*See, e.g.,* Compl. ¶¶ 1, 10-14, 25, 28-30; PI Motion at 2-5; ECF No. 24 at 4-6; ECF No. 28 ¶ 9; ECF No. 32 ¶ 16; ECF No. 40 at 3-5). In both *Rockefeller* and *Molinari*, the courts held that the petitioning process for the *presidential primary* was unconstitutional. *See Rockefeller II*, 78 F.3d at 45; *Molinari*, 82 F. Supp. 2d at 59. The parties in *Molinari* even stipulated that the overall ballot access scheme posed an undue burden. *See Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 140 (2d Cir. 2000) (where the court declined to rule on the preclusive effect of the *Molinari* stipulation, because while the question of whether issue preclusion applied against the same defendant was "close," the "merits of [the] case [were] not" close, and so the court affirmed the dismissal on the merits) (citing *Molinari*, 82 F. Supp. 2d at 68-71). In accepting the stipulation in *Molinari*, the court detailed "[t]he underlying factual predicate for [its] agreement with th[at] stipulation." 82 F. Supp. 2d at 71. As further explained below, however, the underlying facts in *Rockefeller* and *Molinari* presented a much higher burden than what Plaintiffs face here. *Id.* That difference in burden is critical, and ultimately fatal to Plaintiffs' case for injunctive relief.

The geographic component to getting on the ballot for the presidential primary was a far greater challenge than that for getting on the Primary ballot—at least twice as great. Here, § 6-136 only requires a campaign to gather 100 signatures from each of *half* of New York's 26 congressional districts to be included on the statewide ballot, whereas the

presidential primary required campaigns to collect signatures in *all* congressional district in New York State, "not to mention the other states." *Prestia*, 178 F.3d at 89 (citations omitted). The 3rd and 5th through 16th congressional districts currently account for voters in Queens, Brooklyn, Manhattan, Staten Island, and the Bronx. *See June 2024 NYC Congressional District Lines*, Board of Elections in the City of New York, https://www.vote.nyc/page/june-2024-nyc-congressional-district-lines (last visited May 7, 2024). Together, these districts amount to 13, or half of the total 26 congressional districts in all of New York State. Thus, the geographical requirement posed by § 6-136 can be satisfied without ever leaving the five boroughs of New York City.

Indeed, Judge Korman expressly contrasted § 6-136 as being less burdensome than the one that applied to presidential candidates, not only because it requires signatures from a lesser number of districts, but also because it requires less signatures overall. *Molinari*, 82 F. Supp. 2d at 60 (comparing the lesser burden of "only obtain[ing] 15,000 signatures" for statewide office ballots under § 6-136 to the additional signatures required by other statutes for presidential ballot access).

Courts also found undue burden in the presidential primary's requirement that each witness must be either a registered Republican within the district the signature came from or be a notary public or commissioner of deeds. *Molinari*, 82 F. Supp. 2d at 70-73; *Rockefeller I*, 917 F. Supp. at 161-62. Instead, here, § 6-132 requires that a witness to a signature be (1) a qualified voter in New York State, (2) enrolled in the same political party as the signatory, and (3) not having previously signed a petition for another candidate in the same office in that race. (*See* Zebrowski Stavisky Decl.) This is logically less burdensome because a single witness may, in theory, collect signatures from voters in all

26 congressional districts, and need not obtain a notary public commission or commissioner of deeds certificate of fitness beforehand.

Further, while § 6-130's remaining requirement that a designating petition set forth "the name of the signer, his or her residence address, town or city (except in the city of New York, the county)" is burdensome, this task was only held to be unconstitutionally burdensome in "combination" with the other factual predicates that are absent here. *Molinari*, 82 F. Supp. 2d at 70; *Rockefeller II*, 78 F.3d at 45. Defendants persuasively bring to the Court's attention several state cases upholding this or similar requirements to specify where a voter signing a petition lives. *Tischler v. Hikind*, 98 A.D.3d 926, 927 (2d Dep't 2012); *Stark v. Kelleher*, 32 A.D.3d 663, 665 (3d Dep't 2006); *Stoppenbach v. Sweeney*, 98 N.Y.2d 431 (2002); *Zobel*, 254 A.D.2d at 521. Plaintiffs also could have conceivably planned to overcome this burden. Plaintiffs could have advised their volunteers that if a signor fell victim to the "town/city trap," the witness should correct that information. (*See* Zebrowski Stavisky Decl. ¶ 24); NYEL § 6-134(6).

Additionally—with respect to whether the burden itself is reasonably related to a government interest, an issue analyzed more fully below—the court in *Rockerfeller* found the option presented to each party in the 1996 presidential race to choose "between a 5%/1250 signature requirement and a 0.5%/1000 signature requirement" as unconstitutionally burdensome. *Prestia*, 178 F.3d at 89 (citing *Rockefeller I*, 917 F. Supp. at 164) ("We conclude that the holding in [*Rockefeller I*] is attributable to—and, therefore, limited to—these special circumstances surrounding the presidential primary process, and that no similar circumstances are presented here.") The "very existence" of an alternative option given to the parties, despite one being easier than the other,

23

demonstrated that these requirements were not reasonably justified by the government's interests. *Id.* at 89 n. 2. The circumstances here are more akin to those in *Prestia* than those in *Rockefeller*—there is no option for the Republican Party, or any other party, to make any such selections varying the signature requirement under § 6-136, because the government has made a reasonable determination that a specific, minimum number of signatures is needed. *Id.*

In sum, in this Circuit, courts have already found requirements akin to those in place here as not unreasonably burdensome, and this Court is not inclined to stray from those findings now. *See Ulrich*, 383 F. Supp. 2d at 407–11 (citations omitted); *Prestia*, 178 F.3d at 89; *Tiraco*, 963 F. Supp. 2d at 194; *Dekom*, 2013 WL 3095010, at *15; *SAM Party*, 987 F.3d at 276; *Rivera-Powell*, 470 F.3d at 470; *McMillan II*, 234 F.3d 1262.

    C.    <u>New York Election Law is Reasonably Related to an Important State Interest</u>

New York State has an important interest in having a fair and timely election. Specifically, there is "an important interest in 'requiring some preliminary showing of a significant modicum of support' before printing a candidate's name on the ballot, so as to 'avoid[] confusion, deception, and even frustration of the democratic process at the general election.'" *Prestia*, 178 F.3d 86 at 88 (quoting *Jenness v. Fortson*, 403 U.S. 431, 442 (1971)). Further, New York State need not "make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Hewes v. Abrams*, 718 F. Supp. 163, 166 (S.D.N.Y.), *aff'd*, 884 F.2d 74 (2d Cir. 1989) (citing first, *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986), then citing, *Jenness*, 403 U.S. at 442).

The process Plaintiffs face, while burdensome, is reasonable and furthers the State's interests. Plaintiffs argue for notice "by the objectors and the Board of Elections" so that witnesses may be "given a chance to express their intent and cure," but those opportunities exist in the same Albany Case and the Board of Elections hearings that Plaintiffs claim to be burdened by. (ECF No. 32 at ¶ 20). Plaintiff points to at least four challenges to signatures for the "town/city trap" that she estimates "a large percent of [the] objections specifications are due to." (ECF No. 32 ¶¶ 15, 17-19). The "town or city" requirement however supports New York's interests in "(i) requiring some preliminary showing of a significant modicum of support, (ii) assuring the validity of the signature and protecting against fraud, (iii) assuring party membership of each signatory and (iv) regulating the number of candidates on the ballot." *Berger v. Acito*, 457 F. Supp. 296, 299 (S.D.N.Y. Sept. 1, 1978); *see also Stoppenbach*, 98 N.Y.2d at 433 (distinguishing *Molinari*, 82 F. Supp. 2d 57); *see also Stark*, 32 A.D.3d at 665 (3d Dep't 2006); *Zobel*, 54 A.D.2d at 521. Although state court decisions are not binding on this Court when determining issues of federal law, the New York State Court's interpretations of the NYEL statutes at issue here are persuasive, particularly in light of the emphasis courts in this Circuit have placed on New York's interest in managing the election process appropriately. *Prestia*, 178 F.3d 86 at 88; *see also McMillan I*, 2010 WL 4065434 at *3; *Hewes*, 718 F. Supp. at 167.

The ballot needs to be certified by a certain date for the election to occur, and there is an important interest in having a fair and timely Primary. NYEL § 4-110, 52 U.S.C.A. § 20302(a)(8)); *see Zobel*, 254 A.D.2d at 521. Defendants properly justify the processes in place in the State's interest in "ensur[ing] reasonably diligent candidates can access the

ballot while also ensuring the ballot does not become confused, cluttered[,] and unwieldy for voters and election administrators; preventing voter confusion and frustration[.]" (Zebrowski Stavisky Decl. ¶¶ 10, 11). As Judge Trager aptly put it, "New York's constitutional power to regulate elections is justified as a way to ensure orderly, rather than chaotic, operation of the democratic process." *Soleil*, 2005 WL 662682, at *5 (dismissing a constitutional challenge to a provision allowing anyone to challenge a petition regardless of political party). In response to the proffered interest the State has in preventing fraudulent elections, Plaintiffs claim that two of the objections they received were forged. (ECF No. 36 ¶¶ 21-36; ECF No. 36, Ex. 3). However, these claims are properly before the County court, as noted in Plaintiffs' answer and counter claims. *See Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005) (absent a clear constitutional violation, a court cannot interfere with the determinations being made in state court).

D.  Plaintiffs Have not Shown Unfair, Unequal, or Disparate Treatment by the Ballot Selection Process

Plaintiffs' claims for relief under the Equal Protection Clause fail for many of the same reasons as their First Amendment and Due Process claims, but also because Plaintiffs only point to disparate treatment due to resources and party support, which are not afforded constitutional protection. Some plaintiffs have successfully argued for some protection where candidates are treated differently due to political party membership. *See, e.g., Credico I*, 751 F. Supp. 2d at 423; *Credico II*, 2013 WL 3990784, at *23 (E.D.N.Y. Aug. 5, 2013). Plaintiffs allude to differential treatment of Republicans and Democrats by NYEL, alleging there are more Democrats in New York and therefore it is

easier for Democratic candidates to collect unique signatures for their designating petitions. (Compl. ¶¶ 124-31). However, none of the documentation Plaintiffs provided the Court include any information about how Democrats are treated differently by the process. To the contrary, Defendants point out that both parties have several candidates that successfully petitioned for statewide ballot access to primary elections in 2018 and 2022. (Zebrowski Stavisky Decl. ¶ 15).

Furthermore, the statutes at issue have survived Equal Protection claims, finding any alleged difference in treatment in candidates not to amount to discrimination. *See McMillan II*, 234 F.3d at 1262; *Rockefeller II*, 74 F.3d at 1380 (where plaintiffs claimed the signature requirement was more burdensome on Republican candidates, because New York State has far more Democrat voters, plaintiffs were unable to plead an Equal Protection claim). Plaintiffs instead point to others within their own party that have attempted to undergo the petitioning process to appear on the ballot for this Primary, and other elections, but have faced the same burdens Plaintiffs have. (*See, e.g.*, ECF No. 38 ¶ 3; ECF No. 28 ¶¶ 2-14, 19; ECF No. 25; ECF No. 1, Ex. 2 ¶ 14). Furthermore, Plaintiffs argue the suit brought against Ms. Castronuova is "misuse" of the court system, "arbitrary, capricious and outright malicious," and other "non-favored" Republican candidates have faced similar lawsuits. (ECF No. 32 ¶¶ 11-12; Complaint ¶ 130). These similarities do not help Plaintiffs, but rather show they have not been singled out in an unconstitutional manner. *See Tiraco*, 963 F. Supp. 2d at 199-200 (where plaintiffs alleged they were treated unfairly in comparison to "favored" candidates, but failed to establish they were the same as those candidates in all relevant aspects, lack of ballot access did not give rise to an Equal Protection claim). Based on the information presented, those who are

petitioning to get access to the ballot are treated equally because they all face the same, or similar, predictably burdensome process. *Id.* (describing the improperly pled "class of one" claim). The fact that a "favored" candidate receives an alternative path to the ballot due to increased resources and party support is not a difference in treatment that the Equal Protection Clause can cure. *Jenness*, 403 U.S. at 434, 440–41 ("We cannot see how [the State] has violated the Equal Protection Clause of the Fourteenth Amendment by making available these two alternative paths, neither of which can be assumed to be inherently more burdensome than the other."); *Dekom*, 2013 WL 3095010, at *11 ("That the petitioning process may, for non-discriminatory reasons, make it more difficult for Plaintiffs to get on the ballot than other candidates does not violate equal protection as there is no constitutional right to have a 'fair shot' at winning the party's nomination.") (citations omitted).

Accordingly, the statutory scheme in place is reasonably related to the important state interest in elections.

III.   <u>Consideration and Balance of the Potential for Harm to Plaintiffs,</u>
       <u>the Hardships of the Parties, and the Public Interest Weighs</u>
       <u>Against Issuance of Injunctive Relief</u>

Finally, in denying injunctive relief, the Court balances the relative harms and hardships to the parties and considers the public interest at stake. In assessing the potential harm Plaintiffs face in the absence of an injunction, the same considerations for the burden placed on Plaintiffs' constitutional rights apply. (*See supra* Part II.B); s*ee Green Party of New York State v. New York State Bd. of Elections*, 389 F.3d 411, 420 (2d Cir. 2004). As for the potential harm to Defendants and the public were an injunction to be granted, the same considerations in assessing New York State's important interest

in conducting a fair election apply. (*See supra* Part II.C). In balancing these competing considerations, Defendants' and the public's interests in an organized and timely election substantially outweigh the burden Plaintiffs' face.

As Defendants note, were the Court to invalidate the rules and intervene to place Ms. Castronuova's name on the ballot despite her Petition falling short of the statutory requirements, many other petitions would also seek to be reassessed under a new standard. Such a change would not only cause great confusion and potentially delay the election, but also be unfair to any candidates that expended great effort and expense to accomplish the hefty task of successfully petitioning to be placed on the ballot.

Plaintiffs also claim they are unable to "campaign, fundraise[,] and build support" on Ms. Castronuova's behalf absent injunctive relief. (*See, e.g.,* ECF No. 40 at 2). While it is true that the petitioning process, and defending the petition against challenges and litigation, poses logistical limitations to the time and funds available to campaign, there are no rules, orders or restraints in place legally prohibiting Plaintiffs from campaigning. As Defendants noted on the record at the April 10 hearing, Plaintiffs may indeed campaign for the election of Ms. Castronuova in the Primary. Also, as Defendants also noted at the hearing, should Ms. Castronuova's name not appear on the ballot, her supporters that wish to vote for her in the Primary may indeed write her name in. Therefore, the balance of the parties' respective harms and interests weigh against issuing an injunction.

IV.    <u>The Initial Complaint Would Have Been Dismissed with Leave to Amend</u>

The Court writes further to inform Plaintiffs that, had they not filed an Amended Complaint prior to issuance of this Memorandum and Order, the Court likely would have

granted Defendants' Motions to Dismiss without prejudice to Plaintiffs filing an amended complaint within thirty days.

Courts are required to give special consideration to pro se litigants. Appearing without counsel, pro se plaintiffs are not expected to meet the same standards required for formal pleadings drafted by lawyers. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The Court must therefore look to the strongest arguments that could be raised based on the allegations contained in a pro se complaint. *Id.*; *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191-93 (2d Cir. 2008). If there is any possibility that "a valid claim might be stated," the Court must give the pro se plaintiff an opportunity to amend the complaint. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

A district court must dismiss a pro se complaint that, "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). To avoid dismissal, a complaint must include facts that show that the defendant may be responsible for the harm to the plaintiff. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "detailed factual allegations" are not required, a complaint that includes only "labels and conclusions" is not enough. *Twombly*, 550 U.S. at 555. A complaint fails to state a claim if it includes only basic claims without any factual details. *Iqbal*, 556 U.S. at 678. Upon considering a motion to dismiss, the Court assumes that the plausible allegations contained in the Complaint are true but does not have to accept the Complaint's legal conclusions. *Id*.

As mentioned throughout this Memorandum and Order, Plaintiffs' original Complaint is deficient in several respects. For example, Plaintiffs did not name a

representative of the NYSBOE to survive Eleventh Amendment defenses, *Credico I*, 751 F. Supp. 2d at 420 (citation omitted), or identify NYRC as a state actor or explain why NYRC's conduct is "fairly attributable to the state" to hold them liable for violation of constitutional rights. S*ee Mecca v. Deutsche Bank Nat'l Trust Co.*, No. 22-cv-2208 (JS) (ST), 2022 WL 2239557, at *4 (E.D.N.Y. June 21, 2022); *Waterman v. Nolan*, No. 23-CV-4903 (JGK), 2023 WL 4134229, at *2 (S.D.N.Y. June 22, 2023). Further, the Complaint also fails to allege specific facts that establish: (1) the burden Plaintiffs face is in excess of what this Circuit has deemed to be constitutional; (2) the petitioning process is not reasonably related to the State's important interest in regulating elections; and, (3) the difference in treatment Plaintiffs face is due to their protected class status, or Plaintiffs are being singled out when compared to others who are substantially similar.

Plaintiffs may, when filing a response to any forthcoming motions to dismiss, attempt to persuade the Court as to why these deficiencies have been cured in the Amended Complaint, or how they could be cured by the filing of a second amended complaint.

Plaintiffs have not established likelihood of success on the merits of their allegations, as required by the extraordinary injunctive relief sought. Plaintiffs may choose to immediately appeal the decision to deny the PI Motion to the United States Court of Appeals for the Second Circuit. *See Adams*, 371 F. App'x 187 (2d Cir. 2010) ("This Court has jurisdiction to review the denial of a preliminary injunction pursuant to 28 U.S.C. § 1292(a)"); *see also Lamont*, 977 F.3d at 176 ("We review a district court's decision to deny a preliminary injunction for abuse of discretion."); *SAM Party*, 987 F.3d at 274 (same); *Monserrate*, 599 F.3d at 153-54 (same).

**CONCLUSION**

For the reasons set forth above, Plaintiffs' requests for a preliminary injunction (ECF Nos. 3, 24) are denied with prejudice, and Defendants' motions to dismiss (ECF Nos. 18, 22) are denied without prejudice. Plaintiff's request for an extension of time to file an Amended Complaint (ECF No. 46) is denied as moot.

Defendants shall respond to the Amended Complaint (ECF No. 47) within 21 days of this Order, whether by answer, motion, or otherwise. Plaintiffs shall have 14 days to oppose any forthcoming motions to dismiss, and Defendants may reply 7 days thereafter. Plaintiffs may file a second amended complaint—or any other motions—only upon prior written request and grant of leave to do so.

The Clerk of Court is respectfully requested to mail copies of this Order to Plaintiffs at the addresses listed on the docket and note the mailing on the docket.

SO ORDERED.

_____

RAMÓN E. REYES, JR.
United States District Judge

Dated: May 9, 2024
Brooklyn, NY